[957 NYS2d 59]

In the Matter of Edwin Lopez, Appellant, v Andrea Evans, Respondent.

First Department, December 27, 2012

## APPEARANCES OF COUNSEL

*Steven Banks, The Legal Aid Society,* New York City (*Elon Harpaz* of counsel), for appellant.

*Eric T. Schneiderman, Attorney General,* New York City (*Simon Heller* and *Alison J. Nathan* of counsel), for respondent.

## OPINION OF THE COURT

FRIEDMAN, J.

██ This appeal requires us to determine whether a parole revocation proceeding may go forward against a parolee who has been found mentally incompetent to stand trial in a criminal prosecution based on the same charges that are at issue in the revocation proceeding. We hold that, under the circumstances of this case, the revocation proceeding may not go forward.

Petitioner Edwin Lopez was sentenced to 15 years to life on a second-degree murder conviction in the 1970s, and was released from prison to lifetime parole supervision on July 20, 1994. On or about August 11, 2008, while he was a resident of a mental health facility, petitioner allegedly assaulted another patient, for which he was arrested and charged with third-degree assault and two lesser charges. The court ordered a psychiatric examination to determine petitioner's fitness to stand trial (*see* CPL art 730), and the two examining psychologists submitted reports, dated August 25, 2008, finding that he suffered from dementia, probably secondary to head trauma, and was unfit to stand trial.[1] Thereafter, a final order of observation was filed

---

1. One of the psychologists wrote in his report:
   "Understanding, Reasoning and Appreciation of Charges: At this ██

committing petitioner to the custody of the Office of Mental Health (*see* CPL 730.40 [1]), and the criminal charges against him were dismissed (*see* CPL 730.40 [2]).

On August 27, 2008, two days after the date of the reports finding petitioner unfit to stand trial, a parole revocation proceeding was commenced against him. It was alleged that petitioner's conduct in the incident of August 11, 2008—the same incident underlying the aborted criminal prosecution—constituted a violation of the conditions of his parole. Before witnesses were called at the final hearing on November 13, 2008, petitioner's counsel objected to going forward on the ground, among others, that, by reason of his mental disability, as determined in the criminal case, he was unable either to understand the nature of the proceeding or to assist in his own defense. This objection was overruled and, after the hearing was completed on December 12, 2008, the administrative law judge found that petitioner had violated his parole and recommended an assessment of 24 months of additional imprisonment, which the Parole Board accepted. On his administrative appeal, petitioner argued that the finding that he was unfit for a criminal trial meant that he was likewise unfit to defend himself in the parole revocation proceeding. In denying the appeal, the administrative panel stated that "mental illness is not an excuse for a parole violation."

■ Petitioner subsequently commenced this CPLR article 78 proceeding challenging the revocation of his parole. The petition

---

time, he is not able to demonstrate either a rational or a [factual] understanding of the proceedings against him. When asked about his own understanding of the current charges against him, Mr. Lopez says, 'Nothing happened.' He is unable to coherently relate the incidents of the day in question. When asked his plans to resolve the charges against him, he replied 'the whole case shall be dismissed.' He did not demonstrate he has an adequate understanding of the roles of his attorney, the DA or ADA, and the Judge."

The psychologist continued:

"Mr. Lopez was unable to enter into a rational and meaningful discussion of his legal defense options. Although he had some awareness of the nature of legal charges against him, his thinking was unfocused and rambling. He was not able to effectively assist counsel.

"It is my opinion that his cognitive disorder and possible Dementia would prevent Mr. Lopez from constructing a rational defense and collaboratively working with his attorney. He is not able to adequately convey by his own statements, that he shows a reasonable understanding of the allegations against him and his legal options. He is not able to actively assist in his own defense."

contends that the parole revocation hearing should not have gone forward in light of the finding, rendered just two days before the institution of the parole revocation proceeding, that petitioner was unfit to stand trial on criminal charges based on the same conduct that was alleged to have constituted the parole violation. Petitioner now appeals from the judgment of Supreme Court denying his petition and granting respondent's cross motion to dismiss the proceeding. We reverse.[2]

We agree with petitioner that the basic requirements of due process applicable to a parole revocation proceeding (*see Morrissey v Brewer*, 408 US 471 [1972]) should now be construed to preclude going forward with such a proceeding in the event it is determined that the parolee is not mentally competent to participate in the hearing or to assist his counsel in doing so. As an Indiana appellate court recently observed in considering this issue: "Without competency, the minimal due process rights guaranteed to probationers at probation revocation hearings would be rendered useless" (*Donald v State*, 930 NE2d 76, 80 [Ind Ct App 2010]; *see also State v Qualls*, 50 Ohio App 3d 56, 58, 552 NE2d 957, 960 [1988] ["the effectiveness of the minimal (due process) standards enumerated in *Morrissey* . . . may be rendered null if the defendant is not competent to understand and to participate in or to assist counsel in participating in the proceedings"]). We respectfully decline to follow the contrary holdings on this issue of certain older decisions of other departments of the Appellate Division (*see Matter of Newcomb v New York State Bd. of Parole*, 88 AD2d 1098 [3d Dept 1982], *lv denied* 57 NY2d 605 [1982], *cert denied* 459 US 1176 [1983]; *People ex rel. Porter v Smith*, 71 AD2d 1056 [4th Dept 1979]; *People ex rel. Newcomb v Metz*, 64 AD2d 219 [3d Dept 1978]).

In this case, there is no question that petitioner was incompetent at the time of his parole revocation hearing. On August 25, 2008, only two days before the parole revocation proceeding was instituted and less than three months before the commencement of the hearing thereon the following November, he was found incompetent to stand trial on criminal charges based on

---

**2.** [2] Although we have been advised that, since this appeal was argued, petitioner has once again been granted parole, this appeal comes within the exception to the mootness doctrine for orders raising novel and substantial issues that are likely to recur but to evade appellate review (*see Mental Hygiene Legal Servs. v Ford*, 92 NY2d 500, 505-506 [1998]).

the same conduct alleged to constitute the violation of his parole.[3] Since a determination of incompetency was here made independent of the parole revocation proceeding, the instant appeal does not present us with the questions of (1) whether the Parole Board has authority to determine a parolee's competence to undergo a revocation hearing and, (2) if not, what should be done when it appears that a parolee charged with a violation may be incompetent. Nevertheless, the concurrence would have us address these unposed questions in a manner sure to cause significant disruption to the parole system of this state. The concurrence apparently would hold that, until the legislature enacts statutory provisions specifying the procedures to be followed in determining the competency of an alleged parole violator, the Parole Board may not make such a determination. Given the holding that an incompetent parolee may not be subjected to a parole revocation hearing, the effect of adopting the concurrence's position would be to bring to a halt any parole revocation proceeding against a person willing to place his or her own competence in question. In essence, this would excuse such a parolee from complying with the conditions of his or her parole until the legislature acts.

Even if this appeal did present the question of the authority of the Parole Board to determine the competence of an alleged parole violator, we would see no reason to hold that the Board may not render such a determination (in a case where it appears that the parolee's competence may reasonably be questioned) until the legislature has enacted procedures to govern the making of such a determination. After all, even *Newcomb* held that the Board of Parole should, in an appropriate case, "consider[ ] . . . a person's mental competency during the parole revocation process" (64 AD2d at 222), albeit only as a "possibly mitigating or excusing" factor rather than as a prerequisite to going forward with a revocation hearing (88 AD2d at 1098, citing 64 AD2d at 223). To be sure, it would be beneficial for the legislature to enact procedures and schedules to govern competency issues in parole revocation proceedings. However, contrary to the concurrence's assertion that we "agree[ ] that the legislature *must* act" (emphasis added), until the legislature chooses to take action, we are not aware of any impediment, either in constitutional principle or in article 12-B of the

---

**3.** There is nothing in the record to indicate that any change in petitioner's mental condition occurred between the finding of incompetence in the criminal case and his parole revocation hearing.

Executive Law (governing the jurisdiction and operation of the Board of Parole), to the Board, upon ascertaining that the parolee's competence is in question, receiving evidence on the parolee's mental condition and ruling on his or her competence at the outset of a revocation hearing. Of course, a finding of competence will be subject to judicial review in an article 78 proceeding brought to challenge an ultimate revocation of parole.

The concurrence professes to believe that the absence of a statute expressly authorizing the Board to determine the competence of an alleged parole violator means that, until the statutory scheme is amended, a revocation proceeding must come to a halt whenever it reasonably appears that the alleged violator may be incompetent. We disagree. "It is well settled that an agency's powers include not only those expressly conferred, but also those *required by necessary implication*' " (*Matter of Mercy Hosp. of Watertown v New York State Dept. of Social Servs.*, 79 NY2d 197, 203 [1992] [emphasis added], quoting *Matter of City of New York v State of N.Y. Commn. on Cable Tel.*, 47 NY2d 89, 92 [1979]; *see also* 2 NY Jur 2d, Administrative Law § 26). For example, in *Mercy Hosp.*, the Court of Appeals held that the Department of Social Services' use of random sample audits (rather than individual review of all cases within the audit period) to determine whether the petitioner had received Medicaid overpayments was, by necessary implication, within the agency's statutory authority to administer the Medicaid program.

From our holding that an alleged parole violation cannot be adjudicated while the parolee is incompetent, it follows that a determination of the parolee's competence (where it is in question) is a necessary prerequisite to the Board's determining whether to exercise its statutory "power to revoke the community supervision status" of the parolee (Executive Law § 259-c [6]).[4] The situation is analogous to circumstances giving rise to a question of administrative jurisdiction, where it is recognized that, "[l]ike a judicial tribunal, an administrative tribunal has jurisdiction to determine its own jurisdiction" (*Pesta v Department of Corr.*, 63 So 3d 788, 791 [Fla Dist Ct App

---

4. At the time of the relevant events, Executive Law § 259-c (6) provided in pertinent part that the Board had "the power to revoke the presumptive release, parole, conditional release or post-release supervision status of any person." The amendment of the statutory language (by L 2011, ch 62, § 1, part C, § 1 subpart A, § 38-b) does not appear to have been intended to effect any substantive change in the law.

2011]; *see also Whitehall ex rel. Wolfe v Ohio Civ. Rights Commn.*, 74 Ohio St 3d 120, 123-124, 656 NE2d 684, 688 [1995] ["a(n) (administrative) tribunal having general subject matter jurisdiction of a case possesses authority to determine its own jurisdiction"]; 2 Am Jur 2d, Administrative Law § 284). As the Connecticut Supreme Court has explained:

> "Where there is in place a mechanism for adequate judicial review . . . , it is the general rule that an administrative agency may and must determine whether it has jurisdiction in a particular situation. When a particular statute authorizes an administrative agency to act in a particular situation it necessarily confers upon such agency authority to determine whether the situation is such as to authorize the agency to act" (*Greater Bridgeport Tr. Dist. v Local Union 1336, Amalgamated Tr. Union*, 211 Conn 436, 439, 559 A2d 1113, 1115 [1989] [internal quotation marks and brackets omitted]).

Similarly, here, the statute authorizing the Parole Board to determine whether a parolee has violated parole necessarily confers upon the Board authority to determine whether the parolee possesses the mental competence required for such a determination to be rendered in accordance with due process.[5]

While the concurrence takes us to task for stating that the Parole Board should conduct a competency inquiry when it reasonably appears that the alleged violator may be incompetent, our concurring colleague overlooks the fact that, under his analysis, so too will the Board have to determine whether the parolee's competence has been placed in question. Moreover, we

---

5. In support of his view that a parole board has no authority to determine a parolee's mental competence to assist in the defense of a parole revocation hearing, our concurring colleague cites *People ex rel. Marshall v Webster* (266 App Div 637 [3d Dept 1943]). *Marshall* provides no support for the concurrence's position. In *Marshall*, the Third Department disapproved the Parole Board's denial of parole to an inmate otherwise eligible therefor based solely on "the finding of insanity by a prison physician, unsupported and untested, and adopted by the Parole Board without proof" (*id.* at 639). Based on its finding that the Board had, in effect, civilly committed the inmate without a trial on the issue of his sanity (*id.*), the Third Department reinstated the inmate's petition for a writ of habeas corpus and remitted the matter to Special Term "for a trial as to the prisoner's mental condition" (*id.*). In *Marshall*, the Board's finding of insanity, besides having been rendered without due process, was not necessary to any exercise of the Board's lawful powers. Rather, the Third Department found that, in light of the fact that the inmate appeared to be entitled to parole under the law of the time, the Board's purported finding that he was mentally ill and ensuing *denial of parole was an* unauthorized substitute for a civil commitment proceeding.

see no basis for the concurrence's implication that something like chaos will ensue if the Board makes competency determinations—determinations which, to reiterate, will be subject to judicial review—before the legislature acts. To the contrary, in view of our holding that a parole revocation hearing cannot go forward against a mentally incompetent parolee, it would be far more disruptive to prohibit a parole board to determine the competency of a parolee charged with a parole violation. In any event, as previously noted, the question need not be reached in this case, given that petitioner was adjudged incompetent to stand trial in the criminal prosecution arising from the same conduct at issue in his parole revocation proceeding.

Accordingly, the order of the Supreme Court, Bronx County (Mark S. Friedlander, J.), entered February 4, 2011, which denied the CPLR article 78 petition to annul respondent's determination finding that petitioner violated the conditions of his parole, revoking his parole and imposing on him an assessment of 24 months of additional imprisonment, and granted respondent's cross motion to dismiss the petition, should be reversed, on the law, without costs, the petition granted, respondent's determination annulled, petitioner reinstated to parole, and the cross motion denied.

CATTERSON, J. (concurring). In this CPLR article 78 proceeding, I concur with the determination that a finding of mental incompetency to stand trial on misdemeanor charges bars not only criminal prosecution but also a subsequent parole revocation hearing where the alleged parole violation is based on the same conduct that gave rise to the misdemeanor charges. However, I write separately to emphasize that the specific circumstances of this case allow the Court to find in favor of the petitioner without considering the concomitant concerns that have plagued other jurisdictions, namely that the parolee will "remain free as a danger to society because of his unfitness." (*People v Davis*, 127 Ill App 3d 49, 61, 468 NE2d 172, 181 [1984].)

Thus, our decision today also serves to highlight the deficiencies of the statutory scheme. While asserting that this appeal does not require this Court to consider those deficiencies, the majority, in response to this concurrence, posits that the Parole Board may "rul[e] on [a parolee's] competence" until such time as the legislature amends the statutory scheme. For the reasons *set forth more fully* below, in my opinion the Parole Board is not authorized to make such determinations.

The record reflects the following: More than 25 years ago the petitioner was convicted of murder in the second degree and sentenced to a prison term of 15 years to life. He was paroled on July 20, 1994. In 2004, he was admitted to an Office of Mental Health (hereinafter referred to as OMH) psychiatric facility. On August 11, 2008, while on lifetime parole supervision and a resident of the OMH facility, the petitioner allegedly grabbed another patient by the neck and scratched him in the course of a dispute over which television station to watch. He was arrested and charged with assault in the third degree, attempted assault in the third degree, and harassment.

The petitioner underwent a psychiatric examination pursuant to Criminal Procedure Law article 730, and on August 25, 2008, two examining psychologists found him incompetent to stand trial on the criminal charges arising from the incident. The psychologists diagnosed the 52-year-old petitioner with dementia, secondary to head trauma. Petitioner was also diagnosed with cognitive disorder and borderline intellectual functioning, along with a history of heroin abuse, which petitioner reported began at age 14 or 15.

One of two psychologists found that petitioner's

> "cognitive disorder and possible [d]ementia would prevent [him] from constructing a rational defense and collaboratively working with his attorney. He is not able to adequately convey by his own statements that he shows a reasonable understanding of the allegations against him and his legal options. He is not able to actively assist in his own defense."

The second psychologist concurred in this assessment, finding that

> "the [petitioner] is unable to talk about his case in any intelligent fashion. He is not oriented to date or place. He cannot remember three objects after five minutes. He is unable to consider his case in any reasonable fashion, stating that the charges should be dismissed because 'I think I carried myself too fast.' "

The psychologists found that the petitioner did not understand the allegations against him, nor could he recall that the incident occurred at the psychiatric facility where he had been living for years. It was noted, in an understatement, that the petitioner is

"an unreliable historian," as he cannot accurately recall events in his life. The petitioner told the psychologists that he sustained a head injury in either an assault or a motor vehicle accident, but could not remember which.

One of the psychologists further observed that the petitioner's "continuity of thought is often unfocused and rambling," and he is "confused, and disoriented to date . . . At this time, he is not able to demonstrate either a rational or a factual understanding of the proceedings against him. When asked about his understanding of the current charges against him, [the petitioner answered] 'Nothing happened.' "

A final order of observation was entered in the criminal court committing petitioner to the custody of OMH and dismissing the misdemeanor charges against him pursuant to CPL 730.40 (2). On August 27, 2008, while petitioner was in the custody of OMH, respondent Division of Parole commenced a parole violation proceeding against the petitioner based on the alleged assault. A preliminary hearing was held on September 5, 2008. The administrative law judge (hereinafter referred to as the ALJ) found that there was probable cause to believe that the petitioner violated the New York State Division of Parole conditions of release when "he did chase, grab[ ] and attempt[ ] to choke another patient . . . by grabbing him by the neck." Rule 8 of the conditions of release require that a parolee "will not behave in such manner as to . . . threaten the safety or well-being of himself or others." (9 NYCRR 8003.2 [h].)

At the final hearing held on November 13, the petitioner's counsel raised several objections, including that the petitioner was unable to assist in his own defense. His objections were overruled. When the final hearing was continued on December 12, 2008, a social worker for the Legal Aid Society's Parole Revocation Defense Unit testified that the petitioner was unable to assist counsel in obtaining information regarding his defense. Counsel requested that the parole warrant be vacated and that the petitioner be returned to the custody of OMH, the agency that he believed was best equipped to address the petitioner's medical and psychiatric needs.

On December 12, 2008, the ALJ sustained the charge against the petitioner as a parole violation. Wholly inexplicably, the ALJ recommended that the petitioner be returned to the custody of the New York State Department of Correctional Services (hereinafter referred to as DOCS) and incarcerated for a period of 24

months.[1] The ALJ, without explanation, stated that the violation was "especially serious," and that the alternatives to incarceration were considered but not appropriate.

On April 29, 2009, the petitioner filed an administrative appeal, arguing that his due process rights had been violated when the respondent proceeded against him for the parole violation despite the finding that he was not competent to defend himself in the related criminal case. The appeals panel denied the appeal, noting that "mental illness is not an excuse for a parole violation"; which, of course, misses the point and misstates the question presented by the appeal.

On August 23, 2010, the petitioner commenced the instant article 78 proceeding, contending that the appeal was improperly denied. The respondent cross-moved to dismiss the proceeding on September 9, 2010, on the ground that the petitioner had been accorded his full due process rights.

In a January 2011 decision, Supreme Court denied the petition. The court held that in the absence of controlling precedent from this Court, it was bound by *People ex rel. Newcomb v Metz* (64 AD2d 219 [3d Dept 1978]) and *Matter of Newcomb v New York State Bd. of Parole* (88 AD2d 1098 [3d Dept 1982], *lv denied* 57 NY2d 605 [1982], *cert denied* 459 US 1176 [1983]), which held that a finding of competency was not a prerequisite to conducting a parole revocation hearing. This finding was also adopted by the Fourth Department in *People ex rel. Porter v Smith* (71 AD2d 1056 [4th Dept 1979]).

I agree with the majority's position declining to follow the holdings of *Newcomb* and *Porter,* but only to the extent that lack of a statutory provision to determine competency in those cases is irrelevant in this case, given that, unlike in *Newcomb,* the petitioner in this case was adjudged incompetent to stand trial pursuant to CPL 730.40. Thus, the principal issue before the Court is whether that finding also serves to bar a parole revocation hearing.

It has long been established that the conviction of a legally incompetent person is a violation of due process. (*Medina v California,* 505 US 437 [1992]; *Pate v Robinson,* 383 US 375 [1966].) This prohibition, which has its roots in the common law, is a corollary of the ban against trials in absentia, on the theory that a mentally incompetent defendant, even if physically present

---

**1.** The petitioner was denied re-release at the conclusion of the 24 months and ordered to be held for an additional 24 months.

in the courtroom, is unable to aid in his own defense. (*Drope v Missouri*, 420 US 162 [1975]; *see People v Gensler*, 72 NY2d 239 [1988], *cert denied* 488 US 932 [1988]; *People v Pena*, 251 AD2d 26 [1st Dept 1998], *lv denied* 92 NY2d 929 [1998].) As eighteenth century jurist Sir William Blackstone explained:

> "[I]f a man in his sound memory commits a capital offence, and before arraignment for it, he becomes mad, he ought not to be arraigned for it; because he is not able to plead to it with that advice and caution that he ought. And if, after he has pleaded, the prisoner becomes mad, he shall not be tried; for how can he make his defence?" (4 William Blackstone, Commentaries on the Laws of England at 24.)

An accused who lacks the "present ability to consult with his lawyer with a reasonable degree of rational understanding," and "a rational and factual understanding of the proceedings against him" may not be subjected to a trial. (*People v Pena*, 251 AD2d at 30.) Accordingly, a trial court has an obligation to order an examination at any time after a defendant's arraignment "when it is of the opinion that the defendant may be an incapacitated person." (CPL 730.30 [1].) Should the defendant be found incompetent, the court must adjudicate him or her an incapacitated person, and the criminal charges will be dismissed or stayed until the defendant regains his or her capacity. (CPL 730.40 [1] [2], [3].)

In *People ex rel. Menechino v Warden, Green Haven State Prison* (27 NY2d 376 [1971]), the Court of Appeals observed that

> "[w]hen all the legal niceties are laid aside[,] a proceeding to revoke parole involves the right of an individual to continue at liberty or to be imprisoned . . . [and therefore] involves a deprivation of liberty just as much as did the original criminal action and . . . falls within the due process provision of section 6 of article I of our State Constitution." (27 NY2d at 382 [internal quotation marks omitted].)

The following year, in *Morrissey v Brewer* (408 US 471 [1972]), the United States Supreme Court set forth guidelines for the level of due process required in order for a state to deprive a parolee of his liberty interests. The *Morrissey* petitioners filed habeas corpus petitions alleging that they had been denied due process because their paroles had been revoked without a hearing.

The Court examined the function of the parole system and determined that the "essence of parole is release from prison," and that revocation of parole "deprives an individual . . . of the conditional liberty properly dependent on observance of special parole restrictions." (408 US at 477, 480.) The Court stated that

> "[t]he liberty of a parolee enables him to do a wide range of things open to persons who have never been convicted of any crime. The parolee has been released from prison based on an evaluation that he shows reasonable promise of being able to return to society and function as a responsible, self-reliant person. Subject to the conditions of his parole, he can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life. Though the State properly subjects him to many restrictions not applicable to other citizens, his condition is very different from that of confinement in a prison." (408 US at 482.)

The Court noted that the freedom of a parolee "includes many of the core values of unqualified liberty and its termination inflicts a 'grievous loss' on the parolee." (408 US at 482.) "[T]he liberty is valuable and must be seen as within the protection of the Fourteenth Amendment[,] [and] [i]ts termination calls for some orderly process, however informal." (*Id.*)

Thus, the *Morrissey* Court found that a parolee must be provided with: (1) written notice of the claimed parole violations; (2) disclosure of the evidence against the parolee; (3) an opportunity to be heard and present witnesses and documentary evidence; (4) an opportunity to confront and cross-examine adverse witnesses; (5) review of the evidence by a "neutral and detached hearing body"; and (6) a written statement of reasons for revocation and the evidence relied upon. (408 US at 489 [internal quotation marks omitted].) In *Gagnon v Scarpelli* (411 US 778 [1973]), the Supreme Court confirmed that in order to meet due process requirements, a parolee (and a probationer) must be provided with a preliminary and a final revocation hearing.

New York has codified these rights in Executive Law § 259-i, pursuant to which a parolee is entitled to be given a preliminary hearing within 15 days after the warrant for retaking and temporary detention has been executed, unless he has been

convicted of a new crime. (Executive Law § 259-i [3] [c] [i].) The standard of proof at the preliminary hearing is probable cause to believe that the parolee has violated one or more conditions of parole "in an important respect." (Executive Law § 259-i [3] [c] [iv].)

At a preliminary hearing, "the hearing officer shall review the violation charges with the alleged violator, direct the presentation of evidence concerning the alleged violation, receive the statements of witnesses and documentary evidence on behalf of the prisoner, and allow cross examination of those witnesses in attendance." (Executive Law § 259-i [3] [c] [v].) The Parole Board decides on a case-by-case basis whether, in its discretion, due process requires the assistance of counsel at a preliminary hearing. (*People ex rel. Calloway v Skinner*, 33 NY2d 23 [1973].) At the preliminary hearing, a parolee has the right to "appear and speak in his or her own behalf . . . introduce letters and documents . . . present witnesses who can give relevant information to the hearing officer . . . [and] confront the witnesses against him or her." (Executive Law § 259-i [3] [c] [iii].)

A final revocation hearing must be scheduled to be held within 90 days of the probable cause determination. (Executive Law § 259-i [3] [f] [i].) A parolee is entitled to written notice of his or her rights, including his or her right to counsel at that hearing and his or her right to present mitigating evidence relevant to restoration of parole. (§ 259-i [3] [f] [iv].) At this hearing, the charges are read and an alleged violator may plead not guilty, guilty, guilty with an explanation or stand mute. (§ 259-i [3] [f] [vi].) The standard of proof at a final revocation hearing is a preponderance of evidence. (§ 259-i [3] [f] [viii].) As in the preliminary hearing, the parolee has the right to confront and cross-examine adverse witnesses, present witnesses and documentary evidence in defense of the charges, and present witnesses and documentary evidence relevant to the question of whether reincarceration is appropriate. (§ 259-i [3] [f] [v], [vi].)

Thus, although a parolee does not, as respondent points out, enjoy the "full panoply of rights" accorded a criminal defendant, such as the application of formal rules of evidence and certain procedural rights accorded at trial, he or she is nonetheless entitled to certain basic due process protections. It is axiomatic that in order to meaningfully exercise these rights, a parolee must, as in the case of a criminal defendant, have "a rational and factual understanding of the proceedings against him" and be able to "consult with his lawyer with a reasonable

degree of rational understanding." (*See People v Pena*, 251 AD2d at 30.) As the *Morrissey* Court explained, the purpose of a hearing is to "assure that the finding of a parole violation will be based on verified facts and that the exercise of discretion will be informed by an accurate knowledge of the parolee's behavior." (408 US at 484.) When a parolee is incompetent, there is a " 'possibility that [he] might possess information which would prove him innocent but which he is unable to communicate to his attorney.' " (*See People v Davis*, 127 Ill App 3d at 61, 468 NE2d at 180-181, quoting *Pierce v State Dept. of Social & Health Servs.*, 97 Wash 2d 552, 559, 646 P2d 1382, 1386 [1982].)

I therefore agree, as does the majority, with numerous other jurisdictions that a parole revocation proceeding violates due process protections when the parolee is incompetent to assist in his or her own defense. (*See e.g. Donald v State*, 930 NE2d 76, 80 [Ind Ct App 2010] ["(w)ithout competency, the minimal due process rights guaranteed to probationers at probation revocation hearings would be rendered useless"]; *State v Stanley*, 2008 WL 427289, *4, 2008 Tenn Crim App LEXIS 88, *12 [2008] ["fundamental rights . . . 'would be meaningless to an incompetent probationer' " (quoting *Harrison v State*, 905 So 2d 858, 860 [Ala Crim App 2005])]; *State ex rel. Vanderbeke v Endicott*, 210 Wis 2d 502, 515, 563 NW2d 883, 887 [1997] ["(n)otice and hearing are meaningless guaranties to a probationer who is incompetent"]; *State ex rel. Juergens v Cundiff*, 939 SW2d 381, 382 [Mo 1997] [having been granted the rights to "notice and the opportunity to be heard on the issues of whether he violated a condition of probation," "it can hardly be imagined that the general assembly did not intend for (a) probationer( ) to proceed to hearing without having capacity to exercise them" (internal quotation marks omitted)]; *State v Singleton*, 322 SC 480, 472 SE2d 640 [1996]; *State v Qualls*, 50 Ohio App 3d 56, 58, 552 NE2d 957, 960 [1988] ["the effectiveness of the minimal standards enumerated in *Morrissey* . . . may be rendered null if the defendant is not competent to understand and to participate in or to assist counsel in participating in the proceedings"]; *People v Davis*, 127 Ill App at 61, 468 NE2d at 180 ["(t)he intelligent exercise of (due process) rights is prevented if a (conditional release) defendant is unfit"]; *Thompson v State*, 654 SW2d 26, 28 [Tex Ct App 1983] ["due process requires that no person may suffer revocation of his probation while incompetent"]; *Commonwealth v Megella*, 268 Pa Super 316, 321, 408

A2d 483, 486 [1979] ["the revocation of probation and subsequent re-sentencing of a defendant who is mentally incapable of participating in the proceeding is a violation of due process"]; *Hayes v State*, 343 So 2d 672, 673 [Fla Dist Ct App 1977] [a probationer facing revocation must be "mentally capable of assisting in the conduct of that defense"]; *People v Martin*, 61 Mich App 102, 107-108, 232 NW2d 191, 194 [1975] ["(i)t would be fundamentally unfair to require a revocation hearing and then not ensure the safeguard that defendant understands the nature and object of the proceedings against him and that he is able to assist in his defense in a rational way"]; *see also* 28 CFR 2.8 [c] [2] ["(i)n the case of a parolee in a revocation proceeding, the Regional Commissioner shall postpone the revocation hearing and order that the parolee be given a mental health examination"]; *United States v McCarty*, 747 F Supp 311 [ED NC 1990] [where the parole revocation hearing was suspended because the parolee was unfit to proceed, a separate motion to determine present mental condition should be treated similar to a request for a determination of the parolee's competence to stand trial]; *United States v Avery*, 328 F Supp 2d 1269 [MD Ala 2004] [where there was reasonable cause to believe parolee was not sufficiently competent to go forward with supervised released modification hearing, the court applied pretrial-detainee competency procedures outlined in federal statutes].)

Clearly, therefore, *Newcomb*'s compromise solution, of merely "taking into account" a parolee's mental incompetency in the disposition stage of a parole revocation hearing is unsatisfactory since, as the petitioner persuasively asserts, it assumes that the actual parole violations have been proved.

In this case, the record reflects that a nurse at the OMH psychiatric facility "credibl[y] testified" that

> "[p]arolee was in the ward day room watching television when another resident came to the staff area and asked about watching a movie on television in the day room. Parolee began to stare at the other resident . . . . The nurse fearing a confrontation, when parolee began to walk towards [the other resident], said 'Stop, stop!' [The other patient] ran away. Parolee chased him and grabbed him by the neck from behind. Staff members had to disengage them."

The petitioner was entitled to have an opportunity to rebut this account by showing, "that he did not violate the conditions,

or, if he did, that circumstances in mitigation suggest that the violation does not warrant revocation." (*Morrissey*, 408 US at 488.)

There is no indication that the petitioner in this case could remember or articulate the facts surrounding the incident much less "explain away the accusation of a parole violation." (*Morrissey*, 408 US at 484 n 12 [internal quotation marks omitted].) As the petitioner asserts, if he cannot understand the allegations and criminal charges against him at a trial, then a review of the violation charges against him at a preliminary parole revocation hearing is meaningless. If he cannot recall or relate the facts surrounding the alleged assault for the purposes of formulating a defense at a criminal trial, then he cannot "speak in his . . . own behalf" or cross-examine witnesses at the preliminary hearing. Furthermore, a parolee who cannot communicate effectively with his attorney at trial because he "has difficulty finding the right words to express himself," "his use of language is quite peculiar," and he is unable to "coherently relate the incidents of the day in question," is equally unable to communicate effectively with his attorney during the parole revocation process.

The respondent's argument that the nature of a parole revocation proceeding is substantially different from that of a criminal conviction where the defendant is cloaked in the presumption of innocence is without merit. A parole revocation hearing is a two-step process in which it first must be established that the parolee committed a violation. While the standard of proof is lower, nevertheless, there is no presumption that the parolee committed the violation until it is proved by a preponderance of the evidence.

Further, the respondent's argument that a parolee who is incompetent to assist in his defense at a criminal prosecution may nonetheless be capable of participating in parole revocation because it is a less formal process is also without merit. The respondent has put forth no evidence that a parolee such as the petitioner in this case, who was found by a psychologist to lack "an adequate understanding of the roles of his attorney, the DA or ADA, and the Judge" at a trial, is more likely to understand the roles of their analogs at a revocation hearing (i.e., his attorney, the parole revocation specialist representing the Division of Parole, and the hearing officer). There is also no support for the respondent's contention that the more lenient evidentiary standards in a parole revocation proceeding would be more

comprehensible to petitioner than the evidentiary standards in a criminal prosecution.

Moreover, as petitioner posits, the lesser standards of proof at parole revocation hearings arguably make it *more* imperative that a parolee be mentally competent to assist in his or her own defense. A criminal defendant, who is presumed innocent, need not present a defense or challenge the State's evidence in any way, yet still is entitled to an acquittal unless the prosecution proves its case beyond a reasonable doubt. At a parole revocation hearing, the Division need only show probable cause at the preliminary hearing and prove a charged violation by a preponderance of the evidence at the final hearing. Thus, as the petitioner points out, the failure of a parolee to present a factual defense to the charge or confront the witnesses against him is likely to result in the revocation of parole.

However, the determination that a finding of mental incompetency bars a revocation hearing into alleged parole violations cannot end the inquiry. While the statutory scheme provides for the retention of an incompetent parolee for psychiatric observation, retention of a parolee who has committed a misdemeanor or violation is not designed to extend until such time that the parolee regains competency, or even until it is determined whether parolee will or will not regain it.[2] Under CPL 730.40, if a parolee commits a misdemeanor and is then found incompetent to stand trial, the court will dismiss the criminal charges and the parolee is committed to the custody of the state commissioner and placed in an OMH facility under a final order of observation. (CPL 730.40 [1], [2]; 730.60 [1].) Within 72 hours of receiving an incompetent parolee who "has . . . a pending parole revocation hearing," the facility will conduct an evaluation to determine

---

**2.** The statutory provisions differ for a parolee who has committed a felony and been found incompetent. CPL article 730 authorizes commitment and multiple orders of retention where an incompetent felony defendant is not eligible for civil commitment, but the court feels that further retention is needed due to his incapacity to stand trial. (*People v Lewis*, 95 NY2d 539 [2000], *cert denied* 534 US 833 [2001].) An incompetent parolee who has committed a felony may be in a psychiatric facility in the custody of the commissioner in this manner for up to two thirds of the maximum prison sentence for the highest level felony for which he was indicted (CPL 730.50 [3]) or a "reasonable period of time necessary to determine whether there is a substantial chance of his attaining th[at] capacity . . . in the foreseeable future" (*Jackson v Indiana*, 406 US 715, 733 [1972] [internal quotation marks omitted]). During this time, the criminal action is suspended—the charges are not dismissed until after the orders of commitment or retention have expired. (CPL 730.60 [2].)

"(*a*) if the person has a mental illness for which care and treatment as a patient in a hospital is essential to such person's welfare;

"(*b*) if the person's judgment is so impaired that he is unable to understand the need for such care and treatment; and

"(*c*) if, as a result of mental illness, the person poses a risk of harm to self or others." (14 NYCRR 540.6 [a] [1] [i]; [2] [ii].)

If an incompetent parolee meets all of these criteria, he becomes a "civil patient," and is retained in the facility as long as he continues to meet the above criteria. (14 NYCRR 540.6 [a] [2] [iii]; [7].) Such custody may, upon review by the facility's forensic committee, convert to involuntary civil commitment. (14 NYCRR 540.9 [g].)

An incompetent parolee who does not meet the above criteria may be freed within days because, although incompetent, he does not pose a danger to himself or others. (CPL 730.60 [3]; 14 NYCRR 540.6 *et seq.*) However, as other jurisdictions have found in similar circumstances, continued parole on the same conditions on which parole was initially granted is problematic. (*See e.g. Pierce*, 97 Wash 2d at 560-561, 646 P2d at 1387 [continued parole on same conditions not in the best interests of the parolee or society].)

Those jurisdictions have grappled with the problem by fashioning judicial remedies such as modifying the conditions of parole by requiring an incompetent parolee to "utilize the voluntary commitment provisions." (97 Wash 2d at 561, 646 P2d at 1387.) In this jurisdiction, however, there exists no statutory provision for modifying parole in any fashion unless the parolee is found guilty of a violation.[3] (*See* Executive Law § 259-i [3] [f] [x].) This result is inimical to the State's interest in protecting the public and ensuring a parolee's successful reintegration into

---

**3.** The *Newcomb* Court observed that the conditions of parole could have been modified to "direct that the parole violator be restored to supervision and to make psychiatric treatment or admission to a hospital for the mentally ill in the Department of Mental Hygiene a condition of parole." (88 AD2d at 1099 [citation omitted].) However, the Court considered this solution in the context of a revocation proceeding in which the parolee was found to have violated his parole. *People v Ainsworth (32 AD2d 839 [1969]), also relied upon in Newcomb,* merely stands for the proposition that upon initial release to parole supervision, the Parole Board may require psychiatric care as a condition of parole. It does not address the issue of modification of parole conditions.

society, and again this statutory deficiency must be remedied by the legislature *rather than by this Court.*

The majority agrees that the legislature must act, but would find that, in the interim, the Parole Board has the authority to "receiv[e] evidence on the parolee's mental condition and rul[e] on his or her competence at the outset of a revocation hearing." Here I must respectfully part company with the majority since in my opinion, the holdings of *Newcomb* are still good law as to the lack of the Parole Board's statutory authority to determine mental competency.

In *Newcomb*, the parolee sought a competency evaluation during his parole revocation hearing. (*People ex rel. Newcomb v Metz*, 64 AD2d 219 [1978], *supra.*) The respondent Parole Board argued that it had "no statutory authority to make a determination of mental competency" in the context of a parole revocation proceeding. (64 AD2d at 220.) Subsequently, the Court correctly found that there is no statutory provision in the Executive Law for such a mental competency evaluation by prison administrators or the Division of Parole. (64 AD2d at 222-223.)

The majority reasons that there is no "impediment, either in constitutional principle or in article 12-B of the Executive Law." However, it is undisputed that there is no statute authorizing the Parole Board to make such determinations, nor is there anything in article 12-B suggesting that the legislature intended to confer such powers on the Parole Board. To the contrary, the fact that the powers and duties of the Parole Board are specifically enumerated in Executive Law § 259-c indicates that the Board may not exercise powers beyond those specifically granted. "An enumerated list warrants an irrefutable inference that omitted items were intentionally excluded." (*Matter of Mayfield v Evans*, 93 AD3d 98, 106 [1st Dept 2012], citing McKinney's Cons Laws of NY, Book 1, Statutes § 240 [mandating the application of the maxim *expressio unius est exclusio alterius* to the construction of statutes].) Moreover, precedent indicates that the legislature did not intend for the Parole Board to make competency determinations. (*See e.g. People ex rel. Marshall v Webster*, 266 App Div 637 [3d Dept 1943] [Parole Board is not authorized to determine whether a prisoner is insane].)

In drafting article 730, which is the "exclusive remedy" for incapacitated defendants, the legislature "balanc[ed] the sensitive policy issues at stake, including the welfare of the mentally ill accused and concerns about public safety," and crafted a

"careful, comprehensive scheme." (*People v Schaffer*, 86 NY2d 460, 464, 466 [1995].) To hold that the Parole Board should make competency determinations without the benefit of "meticulously detailed procedure[s] governing this complex area of law and medicine" (*People v Gensler*, 72 NY2d at 243) similar to those in article 730, even in the interim, indeed can only contribute to the "disruption" that the majority seeks to avoid. The "reasonableness" standard suggested by the majority—that the Parole Board should render a competency determination "when it reasonably appears that the alleged violator may be incompetent"—is too vague to be workable, even as an interim solution.

In this case, fortunately, this Court is not hampered by the lack of a statutory remedy, and need not craft a judicial one since the petitioner was already civilly committed to an OMH facility four years prior to the incident, and he was returned to that same facility under the final observation order after the misdemeanor charges were dismissed. Indeed, the OMH detainer directed that "[i]n the event that the [petitioner] is released from the custody of the New York State Parol[e] Department and/or Department of Corrections, *you are required to return this individual to the custody of OMH at [the OMH psychiatric facility]*" (emphasis added). As petitioner points out, he presented little danger to society and would have received continued care and treatment in the OMH facility.[4]

MAZZARELLI, J.P., RENWICK and FREEDMAN, JJ., concur with FRIEDMAN, J.; CATTERSON, J., concurs in a separate opinion.

Order, Supreme Court, Bronx County, entered February 4, 2011, reversed, on the law, without costs, the petition granted, respondent's determination annulled, petitioner reinstated to parole, and the cross motion denied.

---

4. After being incarcerated for almost four years, the petitioner was scheduled for release from prison on or about November 5, 2012.