OPINION OF THE COURT
Richard Lee Price, J.
By writ of habeas corpus submitted February 18, 2015, petitioner moved for an order vacating his parole warrant and releasing him from the custody of New York State Department of Corrections and Community Supervision (DOCCS or respondent) on the basis that he is being illegally detained because DOCCS failed to consider his mental competency during parole revocation proceedings in violation of the Due Process Clauses of the Fourteenth Amendment of the United States Constitution and New York Constitution, article I, § 6. By decision dated February 24, 2015, this court sustained petitioner’s writ. This expands that decision.
I. Background and Procedural History
On November 1, 1989, judgment was entered against petitioner in Supreme Court, Bronx County (Barrett, J.), convicting him of criminal sale of a controlled substance in the second degree (Penal Law § 220.41) and sentencing him to an indeterminate term of life imprisonment with a mandatory minimum period of 4 years.
On August 1, 1990, judgment was again entered against petitioner in Supreme Court, Bronx County (Goodman, J.), this time convicting him of murder in the second degree (Penal Law § 125.25) and criminal possession of a firearm in the second degree (Penal Law § 265.03). Petitioner was sentenced to an indeterminate term of life imprisonment with a mandatory minimum period of 18 years on the murder conviction, and an *651 indeterminate term of 6 years’ imprisonment with a mandatory minimum period of 2 years on the weapon conviction to be served concurrently with the life sentence.
On or about August 30, 2013, petitioner was conditionally released and scheduled to be supervised by DOCCS for the remainder of his natural life. In connection with his conditional release, petitioner signed a document entitled “Certificate of Release to Parole Supervision” (see respondent’s exhibit A). Prior to petitioner’s release, DOCCS informed him that his failure to abide by these conditions would result in the revocation of his parole. By signing this document, petitioner agreed to comply with the terms and conditions set forth in it, which included:
“CONDITIONS OF RELEASE . . .
“2. I will make office and/or written reports as direct [ed]. . . .
“4.1 will permit my Parole Officer to visit me at my residence and/or place of employment and I will permit the search and inspection of my person, residence and property. I will discuss any proposed changes in my residence, employment or program status with my Parole Officer. I understand that I have an immediate and continuing duty to notify my Parole Officer of any changes of my residence, employment or program status when circumstances beyond my control make prior discussion impossible.”
On September 17, 2013, petitioner was declared delinquent for violating Conditions of Release rule 4 in that “on 9/17/13 and thereafter he failed to comply with his immediate and continuing duty to inform parole of a change of residence from 290 S Ocean Freeport NY when he left without a forwarding address” (see respondent’s exhibit B; violation of release report [VRR]). Petitioner was also charged with violating rule 2 in that “on 9/18/13 and thereafter he failed to make an office report as directed by PO Todd on 9/11/13” (id.).
On September 20, 2013, DOCCS issued parole warrant No. 667401, and lodged it against petitioner on September 21, 2013 (see respondent’s exhibit D).
On September 23, 2013, DOCCS served petitioner with a copy of the VRR, the notice of violation, and notice of the preliminary parole revocation hearing (see respondent’s exhibit E). *652 Petitioner elected to waive the hearing. He subsequently challenged that waiver by writ of habeas corpus moving in Supreme Court, Bronx County, for an order vacating his parole warrant and releasing him from the custody of DOCCS. By decision and order dated January 8, 2014,* that petition was dismissed (Iacovetta, J.).
Then, on February 5, 2014, petitioner moved this court for an order vacating his parole arguing that DOCCS failed to consider his mental competency during parole revocation proceedings in violation of the Due Process Clauses of the Fourteenth Amendment of the United States Constitution and New York Constitution, article I, § 6. By decision and order dated June 24, 2014, this court dismissed the petition with leave to renew upon completion of petitioner’s final parole revocation hearing on the basis that it lacked the statutory authority to issue such an order.
On August 5, 2014, petitioner’s parole revocation matter was restored to the active calendar. At that time, counsel notified respondent that petitioner lacked the capacity to understand the nature of his parole revocation proceeding or assist in his defense. Specifically, counsel represented that petitioner suffered from dementia, had a delusional belief that he was not subject to parole supervision, insisted that he had been exonerated by an international tribunal, and urged counsel to verify such status by contacting either the President or Vice-President of the United States.
On September 30, 2014, DOCCS commenced petitioner’s final revocation hearing, which continued and concluded on October 30, 2014. During the proceeding, Dr. Perry, who performed an independent evaluation of the petitioner, concluded that petitioner indeed suffered from a diminished mental capacity, and indicated that he was not competent to assist in his own defense. Further, given such dementia, the Office of Mental Health designated petitioner a “Is.” As a result of such status, petitioner was to receive intensive supervision.
On December 24, 2014, Supervising Administrative Law Judge (SALJ) Tomlinson sustained charge 2, which specified that petitioner had left his approved residence without permission from his parole officer, and imposed an 18-month time assessment.
*653 Then, as noted, by writ of habeas corpus submitted February 18, 2015, petitioner sought an order vacating his parole warrant claiming DOCCS failed to consider his mental competency during his final parole revocation hearing. By decision and order dated February 24, 2015, this court sustained petitioner’s writ.
II. Discussion
A. Due Process in Administrative Proceedings
It is well recognized that parole revocation proceedings are separate and distinct from criminal prosecutions as the former are governed by an administrative agency rather than through judicial intervention. As such, the full array of constitutional rights and protections afforded a criminal defendant is unavailable to parole revocation proceedings (see Morrissey v Brewer, 408 US 471, 480 [1972]). Identifying those protections that must be extended to parolees, however, is neither simple nor clear especially when wading through the murky waters of the administrative process. Just as criminal constitutional protections cannot be applied wholesale to administrative hearings (Morrissey, 408 US at 480; Matter of State of New York v Floyd Y., 22 NY3d 95, 103 [2013]), though, so too reliance upon civil proceeding precedent, as respondent argues, is inapposite. To equate a civil commitment proceeding where an attorney need only represent the interests of his mentally incompetent client with a parole revocation proceeding requiring a parolee to assist in his own defense is patently absurd. Aside from “notice and hearing[s] [being a] prerequisite to due process” (Joint Anti-Fascist Refugee Comm. v McGrath, 341 US 123, 164 [1951]), there exists a fundamental difference between criminal, administrative, and civil proceedings.
Recognizing that parole supervision and revocation are administrative in nature, the Supreme Court in Mathews v Eldridge set forth three dictates of due process applicable in administrative proceedings: (1) the private interest affected by the official action, (2) the risk of erroneous deprivation of such interest, and (3) the burden on the government (Mathews v Eldridge, 424 US 319, 335 [1976]). While Mathews does not provide a specific framework for assessing due process in parole revocation proceedings, it nevertheless provides the appropriate standard of review (Medina v California, 505 US 437, 443 [1992]).
True, parole is a privilege not a right. It is equally true that parole revocation proceedings place a parolee’s liberty at stake. *654 As such, a minimal amount of due process is owed to a parolee, and courts must ensure that such rights are not discarded (Joint Anti-Fascist Refugee Comm., 341 US at 200-201). Indeed, procedural protections of due process are warranted if an individual would be “condemned to suffer grievous loss of any kind” (Joint Anti-Fascist Refugee Comm. at 168). Revocation of parole exposes a parolee to a return to prison. By all accounts, that certainly constitutes a “grievous loss” particularly where the potential maximum sentence is life imprisonment.
Notwithstanding a convicted felon’s reduced rights in administrative proceedings, it is a basic tenet of society that deprivation of liberty carries with it enhanced due process. It is indisputable that liberty is a significant private interest. It is also indisputable that liberty is at risk during a parole revocation hearing. Thus, when a parolee is facing a charge that he violated a condition of his parole, it is axiomatic that he should at the least be afforded a basic level of due process commensurate with the potential loss of such liberty since it is essentially the functional equivalent of being deprived of the opportunity to be present (Drope v Missouri, 420 US 162, 171 [1975]). Under the Mathews framework, then, proceeding with a parole revocation hearing of a mentally incapacitated parolee unable to assist in his own defense is certainly an abrogation of the Due Process Clause of the Fourteenth Amendment (Morrissey, 408 US at 482).
In this context, where the parolee’s mental health is at issue, it is hardly adequate for counsel alone to protect that right. Indeed, “when a parolee lacks mental competency to stand trial, it is a violation of his or her due process rights to conduct a parole revocation hearing” (Matter of Lopez v Evans, 25 NY3d 199, 202 [2015]). As for the burden on the government of protecting such right, this court believes it would be minimal. Citing the amicus Mental Hygiene Legal Service, the Court of Appeals in Lopez endorsed their proposal “that the Parole Board apply an analog to the procedures set forth under CPL article 730 for an incapacitated defendant charged with a felony to an incapacitated parolee charged with a parole violation amounting to felonious conduct” (id. at 208).
B. DOCCS and Mental Health Evaluations
Among the myriad of DOCCS regulations, many of which relate to mental health evaluations, there are numerous policies mandating when and under what circumstances an inmate’s mental status must be evaluated. For example, 9 *655 NYCRR 7010.2 requires all prisoners to undergo a psychiatric evaluation within 14 days of incarceration. And, under 9 NYCRR 8002.5, inmates are regularly evaluated thereafter. Conspicuously absent from such regulations, however, is any requirement that a parolee’s mental health be evaluated for purposes of a parole revocation hearing. Although the Board of Parole may, if it so chooses, consider an inmate’s mental health before granting parole (Matter of Ebbs v Regan, 54 AD2d 611 [4th Dept 1976]), it is not mandated to do so (9 NYCRR 8002.3 [a]). Yet, mental incapacitation, or a substantial change in an inmate’s mental condition, renders him unfit for release, which results in parole rescission and a temporary suspension of the parole hearing (9 NYCRR 8002.5 [b] [2] [ii] [c]). It follows, then, that mental capacity is no less relevant at a parole revocation proceeding. That there exists no mechanism to order or require such evaluation defies both logic and common sense.
Such regulatory void aside, the Board of Parole should nevertheless “at least consider an alleged parole violator’s lack of mental competency as a mitigating factor when considering [technical] violations of parole which . . . are primarily of a technical nature” (People ex rel. Newcomb v Metz, 64 AD2d 219, 222 [3d Dept 1978]). But while the Metz court determined that the Parole Board should indeed consider mental competency as a factor, the Third Department affirmed a parole revocation despite it being “undisputed that petitioner suffer [ed] from mental illness and ha[d] been diagnosed as a paranoid schizophrenic” (Matter of Newcomb v New York State Bd. of Parole, 88 AD2d 1098, 1099 [3d Dept 1982]). Subsequent progeny have yielded the same result (see Matter of Huggins v Coughlin, 76 NY2d 904 [1990] [upholding disciplinary action against an inmate because the committee considered his mental health and found it to not be a contributing factor, as symptoms were not presenting at the moment of violation]; People ex rel. Porter v Smith, 71 AD2d 1056 [4th Dept 1979] [finding defendant violated parole after assaulting nurses at a mental health institution into which he voluntarily admitted himself]).
Yet, the First Department, stating that a parolee’s mental competency must certainly be considered as a factor, said there was “no reason to hold that the Board may not render such a determination” (Matter of Lopez v Evans, 104 AD3d 105, 109 [1st Dept 2012]). In affirming, the Court of Appeals agreed, noting that a federal hearing examiner may determine whether or not a parolee is mentally incompetent in the framework of *656 the revocation hearing, his mental condition “ ‘shall [be taken] into full account... in determining the facts and recommending a decision as to revocation and reparóle’ ” (Lopez, 25 NY3d at 208, citing 28 CFR 2.8 [e] [2]).
In practice, though, it appears to be ignored, or at most afforded little weight. The reality is that the Parole Board either finds that the mental health issues were not presenting at the moment or, drawing on the protection of society mentality, determines a violation is the preferable outcome. Perhaps this stems from the concern that parolees deemed mentally incompetent who violate parole would be released with no guarantee that they will receive treatment. As understandable as this concern is, a parolee’s mental competency must nevertheless be considered when it reasonably appears he may be incompetent (Lopez, 25 NY3d 199). Ameliorating such concern, however, the Court noted that 9 NYCRR 8003.3 specifically provides that a special condition may be imposed upon a parolee either prior or subsequent to release that he receive psychiatric treatment.
C. Statutory Remedies
Notwithstanding the due process right to be mentally competent at a parole revocation hearing, there presently exists no applicable statutory scheme within which a court may either order a mental health competency evaluation or hearing in parole revocation proceedings. While acknowledging this void, petitioner presents no authority upon which this court could order DOCCS, the Office of Mental Health, or any other administrative agency to perform a mental health evaluation of petitioner, or conduct a competency hearing. The lack of such statutory and regulatory authority coupled with the dearth of case law governing this issue has made a difficult task impossible. It is no wonder that the Court of Appeals in Lopez urged the legislature to address this issue (Lopez, 25 NY3d 199).
a. Criminal Procedure Law Article 730
CPL article 730 specifically authorizes a court to order a mental competency examination of a defendant in a criminal proceeding for the purpose of determining a defendant’s mental fitness. Nevertheless, relying on the First Department’s dicta in Lopez, petitioner, in his initial petition, sought such an order. Had this court done so, the issue presented would certainly have been simplified. Such an order, however, would have been entirely unauthorized since CPL article 730 is limited to crimi *657 nal proceedings, not parole revocation hearings. But Lopez was different because there the court obtained a previously ordered 730 examination that had been conducted two days prior to the parole revocation proceeding (Lopez at 108). Here, unlike Lopez, petitioner had no pending or recent criminal matter in which a CPL article 730 examination could be ordered, nor had there been a previous finding of mental incompetency upon which this court could rely.
Without authority to order a CPL article 730 mental competency evaluation, then, this court could not have done so. Finding that the Parole Board has authority to assess a parolee’s competency to determine whether it has jurisdiction to proceed with the parole revocation proceeding is entirely separate from a court having the authority to order that assessment.
b. Judiciary Law § 2-b (3)
Arguing that “no statutory mechanism appears to exist to enforce petitioner’s due process right to competency is not a basis to throw up one’s hands in resignation” (Letter from The Legal Aid Society, Apr. 1, 2014 at 2), petitioner argued that this court should rely on its
“emergency catchall provision in the Judiciary Law that authorizes a court to do what is necessary in a situation like this one . . . 2-b (3) states that a court has power to devise and make new process and forms of proceedings, necessary to carry into effect the powers and jurisdiction possessed by it.”
While a Judiciary Law § 2-b (3) “necessity” order provides for broad discretion at vital instances of injustice, it is just that: a discretionary power. With such a vague standard, this court was reluctant to employ it, particularly because section 2-b (3) cannot be used to “justify the exercise of powers not specifically bestowed” upon the court by the Constitution or the legislature (Doe v Smith, 29 Misc 3d 530, 535 [Sup Ct, Putnam County 2010, Ecker, J.]). Rather, it is only to be invoked when the “ [legislature has created a vacuum” in which there are no available remedies (People v Thompson, 177 Misc 2d 803, 809 [Sup Ct, Kings County 1998, Kreindler, J.]). In civil matters, an incompetent person may appear by his or her guardian ad litem (see CPLR 1201 et seq.). Although such protection may be insufficient for petitioner here, the legislature has clearly not left any “vacuum” with respect to mental competency in civil proceedings that would warrant an application of Judiciary Law § 2-b (3).
*658 D. Petitioner’s Final Parole Revocation Hearing
Basic jurisprudence strictly establishes that the Parole Board’s authority is separate and distinct from that of the judiciary. Thus, “[¡judicial intervention is warranted only when there is a ‘showing of irrationality bordering on impropriety’ ” (Matter of Silmon v Travis, 95 NY2d 470, 476 [2000], citing Matter of Russo v New York State Bd. of Parole, 50 NY2d 69 [1980], and Matter of Briguglio v New York State Bd. of Parole, 24 NY2d 21 [1969]). In other words, only where the Board’s decision to violate a parolee is arbitrary or capricious may a court intervene. Practically, this standard requires a court to find that the Board’s determination was unreasonable, and without proper consideration of the facts presented.
Under New York law, parole should be granted if there is a reasonable probability that the defendant “will live and remain at liberty without violating the law, and that his release is not incompatible with the welfare of society and will not so deprecate the seriousness of his crime as to undermine respect for law” (Executive Law § 259-i [2] [c] [A]). To be clear, the Parole Board enjoys wide discretion to consider a number of factors when making that determination, including but not limited to a parolee’s achievements in prison, their performance in programs, their release plans, the seriousness of the offense, and recommendations from attorneys. Since parole is a privilege and not a right, violations of parole conditions are taken seriously. In making that determination, the focus shifts to the societal impact and dangers of permitting the parolee to remain at liberty. Such discretion should not, however, in any way result in the degradation of due process. But failing to properly consider a parolee’s mental competency surely does.
Here, petitioner is a 74-year-old man who served 23 years of his life sentence and now “suffers from dementia, is actively psychotic, and displays delusional thinking” (Harpaz affirmation at 5). He truly believes that he is not on parole, was pardoned by President Clinton, is a “generalissimo” in the armed services of the United States, and that 25% of his diamond and gold mine earnings were used by the United States government to construct buildings in Manhattan. He communicated these beliefs to Dr. Perry, a psychiatrist, who concluded that petitioner was in fact mentally incapacitated, and unable to assist in his own parole revocation proceeding defense.
During his final hearing, petitioner freely admitted that he had not informed parole officers of his residence address *659 change, but maintained that since he was no longer on parole, he was under no duty to do so.
“I was told that I was completely free because I was innocent; I have to clear up, if they would call the federal authorities they know I’m not on parole and you don’t want to call, you don’t want to call, why? I got out, they got because I was innocent of the . . . ; because they gave me parole but I’m not parole” (petitioner’s exhibit C).
SALJ Tomlinson, in her December 24, 2014 determination violating petitioner, noted that DOCCS indicated petitioner had a history of and suffered from dementia. Numerous records unequivocally document such dementia as well as other mental health issues. Consequently, DOCCS labeled him a category 1, the significance of which is that he requires intensive supervision. She further noted that petitioner appeared disoriented and confused at the hearing (petitioner’s exhibit B). But perhaps most poignantly, SALJ Tomlinson lamented that she was powerless to order a mental competency examination. The perplexing question for this court is why such inability precluded her from considering petitioner’s diminished mental capacity.
True, the lack of such authority may have prevented her from specifically directing DOCCS to evaluate him for purposes of the revocation proceeding. But, the record is replete with evidence that petitioner was mentally incapacitated to the extent he was unable to adequately assist in his own defense. Given these circumstances, it is incomprehensible that SALJ Tomlin-son rendered a determination violating petitioner for failing to do that which he was mentally incapable of doing, e.g., report to parole and notify them of any residential address change. Even balancing the concern that not violating petitioner would leave him at liberty without their ability to supervise him, a simple GPS monitoring system that would track and communicate petitioner’s location would surely have sufficiently addressed such concern.
III. Conclusion
It is truly unfortunate that no mechanism exists through which a court may order a mental health competency assessment in parole revocation hearings. Nevertheless, proceeding in the manner that DOCCS did here exhibits a flagrant violation of due process. Continuing to operate in this manner, then, *660 exposes DOCCS to the same result reached here: a finding that it abused its discretion it otherwise enjoys.
For the foregoing reasons, petitioner’s writ seeking an order vacating his parole warrant and releasing him from the custody of DOCCS on the basis that he is being illegally detained because DOCCS failed to properly consider his mental competency during parole revocation proceedings in violation of the Due Process Clauses of the Fourteenth Amendment of the United States Constitution and New York Constitution, article I, § 6 is sustained.

 This court notes that although the date appearing on that decision inadvertently reads “January 8, 2013,” it was in fact rendered on January 8, 2014.